UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 3:03CR77(SRU) |
| RALPH CIFARELLI | : | |
| | : | MAY 13, 2005 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND
RESPONSE TO DEFENDANT CIFARELLI'S MOTION TO FILE
LATE OBJECTIONS TO PRESENTENTCE REPORT

The United States of America hereby files this combined Memorandum in Aid of

Sentencing and Response to Defendant Cifarelli's Motion to File Late Objections to Presentence

Report.

I.      Introduction

Defendant Ralph Cifarelli was indicted along with a co-defendant, Cheryl Ann Wambolt,

on March 19, 2003, and was charged with seven counts of committing bank fraud in violation of

18 U.S.C. §§1344 and 2.  Additionally, he and his co-defendant were also charged with three

counts of identity theft in violation of 18 U.S.C. §§1028(a)(7) and 2. As charged in counts one

through seven of the indictment, the two defendants engaged in a scheme to defraud federally

insured financial institutions, by submitting false, fraudulent and forged documents in the names

of customers of the defendants' used car business to the institutions resulting in duplicate loan

checks or fraudulent loan proceeds being issued.  Those illegally obtained proceeds were

deposited into bank accounts under the control of both defendants.  The remaining three counts

of the indictment (counts eight through ten) alleged that the defendants used the social security

numbers of other persons to carry out the bank fraud scheme.

On December 20, 2004, both defendants pleaded guilty to Count One of the Indictment,

and a Presentence Report ("PSR") was prepared.  Defendant Cifarelli has filed objections to the

presentence report.  The United States in this pleading intends to respond to each of these

objections as appropriate.

II. Defendant's Objections to the Presentence Report

(1) Page 2, paragraphs 7 and 8

In his motion, the defendant denies forging any customer's signatures and in support

thereof appends a forensic report initially provided to him by the Government in compliance with

this Court's Standing Order on Discovery.  In this report, the examiner concluded that for some

documents, the examiner could not say whether or not Ralph Cifarelli wrote the questioned

endorsements.  The examiner did opine, however, that with respect to some of the other

questioned endorsements, defendant Cifarelli may not have written them.  The Government will

abide by the examiner's results, which are inconclusive as to some of the questioned signatures.

However, it should be noted that paragraph 9 of the PSR asserts that the defendants either forged

or caused to be forged customers signatures on some of the illicitly obtained checks. [1]  The

customers in whose names the applications for car loans were sent to financial institutions which

resulted in the issuance of the fraudulent or duplicate loan proceeds have all testified that they

did not sign their names to the loan applications.  Moreover, they did not see, nor endorse, the

loan proceeds checks generated by the scheme which ended up in bank accounts controlled by

either or both of the defendants.

----

[1]  Even the indictment alleges that the defendants forged or caused to be forged
customer's signatures on the proceeds checks.  (See paragraphs f and g) of the General
Allegations of the indictment.

At this time, we do not know who signed these customers' names, but the fact remains that the funds generated by the fraudulent applications ended up in accounts under the control of the defendants. Thus it was the defendants who benefitted from this activity. Other than the above, the government does not have any information to controvert defendant Cifarelli's denial that he did not forge any signatures. The United States respectfully suggests that this issue/objection does not need to be resolved by the Court, as whatever decision the Court would reach, would not impact the calculation of the United States Sentencing Guidelines (U.S.S.G.) as contained in the PSR.

(2) Page 2, paragraph 11

In this objection, the defendant asserts that after receiving a telephone call from the Connecticut Bank of Commerce (CBC) about one of his customers, he checked his records and finding problems with four or five customers, he repaid the bank. Although not totally misleading, the defendant's assertion does not fully describe the sequence of events during this time frame.

According to testimony provided by Brett Giardina, who during the relevant time frame alleged in the indictment was the security and compliance officer for CBC, in December of 2000, the bank was contacted by Brenda Chapman who had received a letter from CBC stating that she was late on a payment on a car loan financed by CBC. Ms. Chapman advised the bank that she had no loan with CBC. A loan administration officer investigated and determined that the loan documents, including a credit application that had come from the defendant's business, Auto Dynamics, which had caused the bank to issue the loan in question, had been forged. The CBC security office began to review other loans issued by the bank to and through Auto Dynamics and

identified some five loans that appeared to be fraudulent.

According to Mr. Giardina, he and an officer of the consumer loan division met with Ralph Cifarelli in mid-December to discuss the situation. The defendant explained to the CBC representatives that the problem had been caused by his employee, Cheryl Ann Wambolt, who was booking loans with multiple financial institutions to acquire double commissions on automobile sales. Cifarelli indicated that he would pay the bank for these loans and that Wambolt would be fired. Cifarelli did in fact pay back these five loans.

However, in April 2001, Mr. Giardina learned that new loan applications were again coming to the bank from Auto Dynamics from Cheryl Ann Wambolt who apparently had not been terminated from her employment at Auto Dynamics as he had been led to believe. Giardina ordered a review of loans issued by CBC through Auto Dynamics. In May, while this review was going on, a CBC employee noticed that five loan payments had been received at CBC for five different loans, but that the payments had been made by sequentially numbered checks issued by the North Haven branch of Webster Bank. Further investigation revealed that the five loans were in the names of individuals, some of whom lived far from North Haven, and Mr. Giardina believed it unlikely that all five had gone to the bank at the same time to obtain bank checks to pay their loan. When he contacted the security officer at Webster Bank, he was advised that the five checks had been obtained at one time by a single female.[2] Within a week of

_____

[2] The Government believes that this female was Ashley DeManche, an employee of Auto Dynamics. DeManche has told the investigating agents that she was told by Ralph Cifarelli, and more often by Cheryl Ann Wambolt, to go to various banks and obtain bank checks from those banks in various denominations but with the payee name left blank. She would give those blank checks to Cheryl Ann Wambolt. Since she had done this assignment on multiple occasions, DeManche was unable to remember if she had been the person who had obtained these five sequential checks, although she did admit to having gone to Webster Bank to

this discovery, Mr. Giardina was in contact with a detective from the North Haven Police

Department.  Subsequent investigation determined that the persons in whose names the loans had

been made had no knowledge of these loans and all denied signing loan related documents that

had been received by CBC.

    (3) <u>Page 3, paragraph 12</u>

    In this objection, the defendant does not deny obtaining duplicate loans and asserts that

such conduct is routinely done by car business dealerships.  The United States does not have any

information as to what is routinely done by other car dealers, but it does not stand to reason that

financial institutions would knowingly issue unsecured loans, payable at an unspecified time, and

extended without any documentation as to whom would be responsible for repayment.

Additionally such loan activity would lack any documentation that would be needed should those

loans go unpaid and the bank needed to seek a judicial remedy to collect the funds.  It is hard to

envision banks knowingly placing themselves in that position.  Moreover, if as the defendant

asserts, it was routine for car dealers to obtain duplicate loan proceeds from banks, use the funds

and then repay the loan at some unspecified time between 60 to 90 days later, such a practice

would not explain the reaction by and the steps taken by officers of the Connecticut Bank of

Commerce when they learned of the problem with the Chapman loan as discussed in the prior

section of this memorandum.

    (4) <u>Page 5, paragraph 26</u>

    In this objection, the defendant denies ever having used the name Joseph McLain.  The

United States does not have any information known to it to provide the court with respect to this

---

get checks.

issue.

(5) Page 10, paragraph 38

In this objection, the defendant denies being arrested on January 10, 1995. With respect

to this objection, the United States would note that this arrest and the offense enumerated therein

(issuing a bad check) does appear on defendant Cifarelli's National Crime Information Center

("NCIC") criminal history report or "rap sheet."[3]

(6) Paragraphs 56, 57, 62, 65, 72

The United States has no information to offer about the defendant's assertions, and will

defer to the Court in its resolution of the issues raised to the extent the objection needs to be

resolved.

(7) Page 22, paragraph 84

It is the Government's understanding that the Probation Department has verified that the

defendant has made some payments toward his business' employment tax obligations. The

Government would respectfully ask the Court to include as a condition of any term of

supervision imposed in the forthcoming sentence that the defendant must file his delinquent

personal income tax returns and must keep current on his employer tax obligations.

(8) Page 23, paragraph 95

The defendant claims that his medical condition and the fact that he made full restitution

should be identified as factors which would warrant a downward departure. The PSR did not

identify any circumstance that would warrant a departure from the guidelines. The Government

would agree with the assessment made by the Probation Department.

---

[3] See arrest # 5 on defendant's criminal history report attached as Exhibit One.

(a) Medical Conditions

The United States does not dispute that defendant Cifarelli's medical history as graphically described by the PSR is a significant one.  However, the United States does not believe that such a history calls for, or supports, a downward departure.  The defendant's present medical condition does not seem to present any special needs.  He is not taking any medication for any ailments.[4]  Moreover, his medical history has not impacted his ability to work, start and raise a family, and to buy a nice house to maintain that family.  Accordingly, the United States does not believe that the defendant's medical history is so extraordinary that would take his case out of the heartland and warrant a downward departure.

(b) Pre-Indictment Restitution

The United States does not dispute that the defendant has repaid the loans that were outstanding at the time the federal investigation began, and that at this time of sentencing, the financial institutions who were the victims in this indictment have been made whole and have not suffered a financial loss.  While the United States commends the defendant for doing the right thing, such actions have been held to have no affect on guideline calculations.  Loss in theft cases as contemplated by the Sentencing Guidelines has been determined by what was taken and not by what the ultimate harm was suffered by the victim.  See, e.g., United States v. Brach, 942 F.2d 141, 143 (2d Cir.1991); United States v. Parker, 903 F.2d 91, 104-105 (2d Cir. 1990). Subsequent repayment of moneys taken by a defendant reducing the actual loss suffered by the victim has been held to be insufficient to reduce the amount of loss for guideline calculations. United States v. Arjoon, 964 F.2d 167, 171-172 (2d Cir. 1992).

---

[4]  See paragraph 64 of the PSR.

In essence, the defendant's objection to the presentence report suggesting a downward departure because the loss suffered by the victims has been reduced to zero by his repayment of the loans, amounts to a " rich guy" defense to the Sentencing Guidelines. A downward departure under these circumstances would provide that a defendant could engage in illegally obtaining other person's money or property. If that defendant was never caught, he or she could enjoy the fruits of the crime, but if caught, that same defendant simply could negate any consequences by paying the money back. The United States does not believe such a state of affairs is contemplated by the sentencing scheme established under the Sentencing Guidelines, and is certainly not a message that should be sent to the general public.

III. Sentencing Recommendation

The defendant is before this Court to be sentenced on his plea of guilty to one count of bank fraud. According to his criminal history report, he has had approximately fifteen other arrests many of which resulted in convictions. With the exception of his one prior federal drug conviction, all his previous cases seem to have involved theft type of situations, i.e., larceny, forgery, identity theft, or issuing bad checks; all somewhat similar to his present offense of conviction. From his criminal history sheet, it appears that he invariably has received a probationary sentence of some sort and has never been jailed despite the fact that many of his imposed probationary sentences have been revoked or terminated unsatisfactorily. The United States suspects that to obtain such beneficial sentences after having repeatedly been arrested and prosecuted for similar conduct, the defendant probably paid restitution to the victims of his offense in exchange for favorable non-imprisonment sentences and thus in essence, "bought" his way out of jail.

With respect to the present case, the defendant has continued this pattern. When the federal investigation began, and he was made aware of that investigation, some $121,846.24 was still owed on loans that had been obtained by supplying fraudulent documents to the affected financial institutions. While the investigation continued and evidence was developed through collection of documents and many interviews of Auto Dynamics customers and employees were conducted all of which ultimately lead to the filing of the charges contained in the indictment, the defendant arranged for repayment of those fraudulently obtained loans identified by the investigation. The defendant has now repaid them all, for which the Government is sure the victims of this offense are grateful.

However, as laudable as that action might be, the Government believes that the defendant should not be sentenced to a probationary sentence in lieu of a period of incarceration. The calculation of his guidelines, in particular the determination of his criminal history as Category III, is extremely conservative. Based on his criminal history, he has sufficient convictions to have garnered him some ten criminal history points, but because he had not received any sentences requiring jail, and has essentially always received sentences of probation, only four points are counted. See U.S.S.G. §4A1.1(c). But for the § 4A1.1(c) limitation, he would be in a Criminal History Category V, which when combined with the loss calculated in the PSR, would result in a sentencing range of 33-41 months instead of the range presently calculated at 21 to 27 months.[5]

The United States is not advocating or requesting that the Court consider an upward departure based on an under representation of defendant's criminal history. Rather, the United

---

[5]    See PSR, paragraph 87.

States has provided this information to demonstrate its belief that a sentence within the range as presently calculated would be eminently reasonable. Any sentence short of one involving a term of incarceration would not serve the ends of justice nor would it foster respect for the law as it would easily be viewed by the public as another white collar defendant avoiding just punishment by having money to pay his way out of trouble.

Wherefore, for the preceding reasons, the United States would request that the Court deny the defendant's request for downward departure and impose a sentence within the guideline range as calculated in the PSR.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


MICHAEL E. RUNOWICZ
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT08084
157 Church Street
New Haven, Connecticut  06510
(203) 821-3700

<u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing was mailed, postage prepaid on May 13, 2005, to the

following:


John Kelly, Esq.
Cantor, Floman, Gross, Kelly & Sacramone P.C.
P.O. Drawer 966
378 Boston Post Road
Orange, CT 06477


Richard P. Silverstein, Esq.
50 Elm Street
New Haven, CT 06510


Dennis Linder
U.S. Probation Officer
U.S. Probation Office
915 Lafayette Boulevard
Bridgeport, CT 06604


MICHAEL E. RUNOWICZ
ASSISTANT UNITED STATES ATTORNEY